IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

GENE E. WASHINGTON,        )
     Petitioner,          )    Civil Action No. 7:21cv00627
                        )
v.                      )    MEMORANDUM OPINION
                        )
DEPARTMENT OF CORRECTIONS,   )    By:  Michael F. Urbanski
     Respondent.        )    Chief United States Judge

Gene E. Washington, a Virginia inmate proceeding pro se, has filed a petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, challenging his 2017 Charlottesville Circuit Court convictions and sentences for capital murder and second degree murder.  The respondent has filed a motion to dismiss, and this matter is now ripe for decision.  For the reasons stated below, the court will grant the motion to dismiss.

## I.

On June 21, 2017, Washington entered Alford pleas[1] of guilty to capital murder of RCA and second-degree murder of RCA's 17-year-old daughter, MVA, pursuant to a written plea agreement.  In exchange for his pleas of guilty, the Commonwealth agreed: (1) not to seek the death penalty, (2) to reduce the second charge from first-degree to second-degree murder, (3) to nolle prosequi[2] additional charges of first-degree murder and robbery, and (4) not to file any additional charges against him for other offenses arising out of the same set of

---

[1] An Alford plea is one in which a defendant does not concede guilt but acknowledges that the prosecution evidence is sufficient to support a conviction for the charge.  The plea takes its name from *North Carolina v. Alford*, 400 U.S. 25 (1975), in which the Supreme Court upheld the constitutionality of a court accepting the voluntary and knowing guilty plea of a person pleading "guilty" while maintaining a claim of factual innocence, so long as a strong factual basis supports the plea.

[2] Nolle prosequi is a Latin phrase for dismissal of charges at the request of the prosecution.

events. R.[3] at 275–279. The court reviewed a report from Dr. Murray which found

Washington to be "marginally" competent to stand trial. Plea Tr. at 4. After a lengthy

colloquy with Washington (Id. at 7–20), the trial court found Washington's pleas to be

voluntarily and knowingly made. Id. at 20. The Commonwealth then summarized the state's

evidence as follows:

> [O]n December 5th, 2014, a large house fire was discovered at
> 1627 Rugby Avenue in the City of Charlottesville . . . just before
> 11:50 p.m. Fire was reported by a neighbor, and Charlottesville
> Police, who arrived on sight [sic] first, and Charlottesville Fire
> Department responded. Heavy smoke was coming from the first
> floor, from the upper floor, and from basement windows. There
> was no car in the driveway.[4] The smoke was too heavy for the
> first two police officers to make any entry to see if anyone was
> inside the residence, but there was no sign of residents, as much
> as they could make out. As firefighters entered the residence and
> began working to put out the blaze, while that was in progress, a
> team of two firefighters was downstairs, from the assisting fire
> company from Albemarle County, was in the basement . . . .
> While they were down there they discovered a body . . . at the
> bottom of the stairs, that they had actually gone over as they
> entered the basement. A very short time later a second body was
> found in that same location, and at that point, besides the fire, it
> became . . . a death scene investigation. The bodies were
> identified as the bodies of [RCA], the owner of the home, and
> her daughter, [MVA], seventeen (17) years old. . . . Dr. Austin
> Wiles, . . . with the office of Chief Medical Examiner, conducted
> the autopsies. The cause of death for [RA] was blunt force
> trauma to the head and sharp force injuries to the neck. The
> manner of death was homicide. She had two lethal . . . sharp
> force injuries to her neck. She also had multiple facial and skull
> fractures, and fifteen (15) identified blunt force trauma injuries to
> her head and neck. The cause of death for [MA] was blunt force
> trauma to the head and neck. The manner of death was
> homicide. Dr. Wiles identified eleven (11) contusions to [M's]

---

[3] References to "R." refer to the record of the Charlottesville Circuit Court in *Commonwealth v. Washington*, No. CR15-140, citing the typewritten page numbers in the lower right corner of each page.

[4] A neighbor walking his dog reported that the car had last been seen in the driveway at 6:15 p.m. that evening. Plea Tr. 33.

head and face. He identified three sharp force injuries to her head and neck. He identified a blunt force trauma injury to her neck that resulted in a fractured and collapsed . . . area of the larynx area of the throat. [RA's] car was missing from the driveway. . . . Police found it, with the assistance of Albemarle County Police, at the Barracks Road West apartment complex in Albemarle County on December 6th. The vehicle was parked at Building 2625. Attention was . . . later called to a dumpster at that same apartment complex, because [RA's] old iPhone 6 that she'd only recently given up in the previous couple months was pinging from that dumpster. . . .[B]oth the car and the dumpster were seized. The defendant at that time, Gene Everett Washington, lived at Apartment E in Building 2651 of the Barracks Road West apartment complex. When Charlottesville police processed the dumpster, they retrieved [RA's] iPhone and bags of bloody clothing and implements, including multiple knives and trash bags, rubber gloves in a trash bag, and a stocking cap in a trash bag. They also recovered Nike sneakers that were black, white, and orange shoes. Items from the dumpster were submitted for DNA analysis, and the DNA analysis links the defendant to both the gloves and the stocking cap.

* * * * *

With respect to the car, police had information from a citizen witness, who would have been called to testify at trial, the Gene Washington had pointed the car out to him . . . some period of weeks before the homicides and had indicated a desire to sell that car. The police investigation established that another resident of the apartment complex had set up security footage due to an unrelated concern about his car being vandalized. The footage captured a good portion of the path between the defendant's residence and the dumpster. The footage captured a vehicle consistent with [RA's] vehicle driving through the apartment complex, and in that footage a man whose appearance is consistent with the defendant is seen carrying a white bag and sneakers to the dumpster. Police also found surveillance footage from the Barracks Road ABC store in Charlottesville and from the 7-11 in Charlottesville where Mr. Washington is on that footage during evening hours of December 5th and is wearing the same clothes as the man who is seen in the dumpster surveillance footage. There are individuals who identified to police that the defendant was known to own sneakers consistent with the Nike multicolored sneakers that were recovered from the dumpster, and the

3

defendant can be seen wearing such sneakers in a YouTube video that is connected to him.

\* \* \* \* \*

[O]n December 8th, 2014, the defendant was arrested on a probation violation as he arrived home at the Barracks Road West apartment complex.  Charlottesville police officers participated in that arrest, and he was taken into custody.  He had two cell phones, iPhones on his person that were iPhones that belonged to [RA] and[MA]. . . .[T]here were other phones taken from the defendant, but in particular, phones connected to the victims were on him.  One of the phones found on the defendant had internet search material on setting fires, and during prosecution of this case the defendant made a *pro se* lawsuit against the officers in the case, and also wrote to various public agencies, news media, and so forth.  In some of those letters he admits to presence at the scene.  In a letter to the Attorney General's office postmarked December 15, 2015, the defendant makes statements from which the Court can make an inference that he admits to killing [RCA].

\* \* \* \* \*

[P]olice collected phone records, Apple records, and cell phone records and Facebook records.  They do establish that the defendant, in some form, knew [MA] with telephone contact that had occurred a couple months prior in October.  There's a drum set that's in [MA's] bedroom that is a Facebook profile picture for the defendant, so there's reason to believe that he had some acquaintance with [MA].

*Id.* at 20–22, 25–26, and 28–30.

The Commonwealth then introduced the autopsy reports on RA and MA; DNA analysis reports from buccal swabs of Washington, from the stocking cap, and from the screen of the iPhone; photographs of the crime scene; the letter from Washington to the Attorney General's office, and the transcript of the preliminary hearing in General District Court.  *Id.*  Defense counsel then added that, if the matter had gone to trial, the defense had a DNA expert who would question some of the findings on the reports introduced by the

4

Commonwealth.  Further, DNA evidence on the Nike shoes failed to be matched to Washington, and DNA from scrapings under RA's fingernails generated a DNA profile of a third party who had never been identified.  *Id.* at 32.  The trial court then ordered a presentence report and scheduled the matter for a later sentencing hearing.

At the sentencing hearing on September 25, 2017, the prosecution introduced twenty victim survivor letters from friends of the victims and a victim impact statement from RCA's brother.  Ms. Watson, a special education teacher who worked with RCA (also a teacher), testified that RCA had adopted MVA from the Ukraine when MVA was two years old.  Ms. Watson had been MVA's tutor from fifth grade until MVA's death because MVA had severe learning disabilities.  The prosecution also introduced evidence from law enforcement personnel reflecting how Washington's accounts of the events had changed over time, from denying any involvement at the time of arrest to claiming a sexual relationship with both RCA and MVA, to the version in the presentence report.  The officers acknowledged that telephone records verified telephone and text communication between MVA and Washington during September and October 2014, and Washington's wife had acknowledged to law enforcement that she had been upset by a FaceBook post and by text messages to her husband from MVA just before Mrs. Washington delivered their first child, a son, in October 2014.  No records corroborated any prior communication between RCA and Washington, and there was no confirmation of any communication between Washington and MVA after October 27, 2014.

Washington's version of the events came in through the presentence report.  Essentially, Washington claimed that MVA invited him to the house that day because she

skipped school.  They had sexual relations several times, as they had on prior occasions.

RCA arrived home unexpectedly early and caught them having intercourse.  RCA pulled

MVA off Washington, very upset, and called him a child molester.  RCA was hitting MVA,

and Washington ran to MVA's bedroom to get dressed.  He considered leaving through her

bedroom window but was worried about MVA.  He claimed that RCA attacked both of

them with a knife and a hammer.  He got the hammer away from her and kept swinging.

When he was done, he panicked and did not think the police would believe him, so he

stuffed the hammer and knife in into a bag and left with RCA's car.  On arriving at his

apartment complex, he threw the bag in the dumpster.  R. at 1204–1205.

The presentence report also included Washington's lengthy criminal record, including

a juvenile commitment to the Department of Juvenile Justice for breaking and entering,

eight adult felony convictions (all non-violent), and three probation revocations.  The report

also included information about Washington's difficult childhood at home and at school.

When Washington failed kindergarten, the school recommended an IEP and special

education, but his mother refused.  Washington could not keep up with his classmates and

did poorly in class and on standardized tests.  He never passed a single Standards of

Learning (SOL) test.  He dropped out of school in eleventh grade.  He finally obtained his

GED in 2003 after four attempts.   His home life was equally chaotic.  His mother suffered a

disabling injury when Washington was 8-years-old, and his father then abandoned the family.

Both parents had issues of substance abuse, and  Washington experienced physical and

emotional abuse and neglect from his mother and from her live-in boyfriends.  He also

witnessed violence against his mother.  His residence was not stable, as he moved frequently

6

from his mom's residence to his grandparents and to other relatives and back again.  By the time he left school, he had changed schools twelve times.  He and his younger brother were home alone, sleeping, when their house caught fire and burned to the ground.  His younger brother, with whom he was very close, was shot and killed at age 18, while Washington was in jail.

Defense counsel presented additional mitigating evidence at the hearing.  Dr. Joette James, a neuropsychologist, performed a battery of neuropsychological tests on Washington over six to seven hours.  She also reviewed his records from school, prior therapists, the presentence report, and other available information.  Washington had an adjusted IQ of 72, consistent with the results of tests taken three other times throughout his life.  He also had very low adaptive functioning, which affected his short-term memory, his ability to process information verbally, and his executive functioning, which included emotional regulation, impulse control, and following complex directions.  Sent'g Tr. at 235–283.

Dr. Jeffrey Aaron, a clinical and forensic psychologist with the Virginia Department of Behavioral Health and Developmental Services for over 18 years, had been appointed as the mitigation expert for Washington.  Based on interviews with Washington's family members, review of school and medical records, psychological testing, and other available information, Dr. Aaron outlined the major events of Washington's life while explaining how those events, combined with his intellectual deficits, exacerbated his self-esteem, mental health, and adaptive functioning.  Washington was diagnosed with ADHD as a child, and his adult diagnoses included depression, anxiety, PTSD, and substance use disorder.  His difficulties at school and the emotional and physical abuse from his mother exacerbated

7

Washington's feelings of isolation and being different.  Issues of childhood bedwetting led to tirades and beatings from his mother, which psychologically damaged him and led to more bedwetting.  The low self-esteem, domestic violence, frequent moves, loss of all belongings in the house fire, and death of his brother were adverse events that occurred one after another, with no time to recover from one crisis before the next one occurred.  Because these adverse events occurred one after another, they made Washington less resilient and affected every aspect of his functioning.  As an adult, Washington continued to have intellectual deficits.  He lacked the ability to manage money and to remain employed.  Psychologically, he had substantial impairment in the ability to manage his emotions and to distinguish reality and fantasy.  Based upon his evaluation of Washington, his background, and the way he functioned under stress, Dr. Aaron opined that Washington's conduct on the date of the offense was a panicked and overwhelmed response, not one that was calculated and preplanned.  He did not base his opinion on Washington's statement about what happened, but on Washington's lack of intellectual functioning, impaired problem-solving skills, and poor emotional coping skills that had been documented throughout Washington's life.  Id. at 138–234.

Washington's grandmother, Mrs. Burton, testified about Washington's childhood and the same traumatic events documented in the presentence report and discussed by Dr. Aaron.  She also described him as a very sweet little boy who was easily led by others and was very close to his brother.  She noted that Washington's wife had taken good care of him, maintaining the home, working, paying the bills.  She said Washington had been extremely excited about becoming a father and loved caring for the baby until the time of his arrest.

After considering the evidence, the judge imposed a life sentence for capital murder of RCA and 40 years for the second-degree murder of MVA.  He declined to suspend any portion of the sentence.  Washington filed a motion for reconsideration of the sentence, urging the court to suspend a portion of the time in consideration of his intellectual disability.  The court denied the motion, stating that he had to consider the safety of the community and that he was concerned that Washington might be susceptible to violent impulse control problems in the future.  The final judgment order was entered November 14, 2017.  Washington raised a single issue on direct appeal, that the trial court failed to give appropriate weight to the mitigating evidence.  The Court of Appeals of Virginia denied his appeal on November 20, 2018.  The Supreme Court of Virginia refused his petition for further appeal on May 31, 2019.

Washington asserts that he mailed a petition for habeas corpus to the Charlottesville Circuit Court in early June 2020.  The mailroom log from the prison documents a mailing to the Charlottesville Circuit Court on June 12, 2020.  The log documents two subsequent letters to the circuit court as well, on August 20, 2020, and on December 22, 2020, which Washington represents were his efforts to determine the status of his state habeas.  The clerk's office at the court reports that no habeas petition was ever received.  Further, the clerk's office reportedly has <u>no</u> correspondence from Washington at all in 2020.

Washington filed the current § 2254 petition in November 2021.  His signature was notarized November 4, 2021.  The envelope in which it was mailed was stamped by the mailroom on November 16, 2021, with the postmark the same date.  The petition was

received in the Eastern District of Virginia on November 29, 2021, and subsequently transferred to this court.  In this petition, Washington raises the following claims:

1. He was unlawfully detained, because neither his fingerprints nor DNA were found on any of the murder weapons.

2. Discovery confirms his claim in criminal court that he was acting in defense of others.

3. The trial judge violated the Virginia Canons of Justice by refusing to consider mitigation evidence of three years of history which demonstrated self-defense.

4. The prosecutor violated Washington's rights under the First, Second, Third, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the Constitution.

5. Trial counsel violated rules of professional conduct:

   a. Counsel had a conflict of interest because "counsel represented defendant before while he was innocent of charges, ineffectiveness to non-guilty."

   b. Counsel failed to present "impactful evidence" about his impairment from former therapist.

   c. Charlottesville Police questioned Washington without reading him Miranda[5] rights.

   d. Counsel didn't question investigators about Washington's timeline and his own witnesses.

---

[5] In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court announced a rule requiring officers to advise suspects of their right to remain silent and right to have an attorney before conducting custodial interrogation.

e.  Counsel never questioned prosecution witnesses and investigation witnesses.

f.  Conflict between two attorneys on his capital defense team caused one attorney to leave the case after two and a half years.

g.  Defense investigators did not want to work on his case and refused to investigate matters he asked them to investigate.

h.  Counsel forced Washington to plead guilty by threatening him with death by lethal injection and used his cognitive disabilities against him.

i.  Counsel did not advise Washington that second attorney and mitigation social worker had resigned from the office until it had already happened, and it was too late for Washington to build trusting relationships with new members of the defense team.

j.  Counsel failed to report police misconduct in fabricating phone records and failing to read Miranda rights and failed to report prosecutorial misconduct of applying the Commonwealth's theory to petitioner's timeline.

k.  Counsel never explained the relationship evidence to the court.

l.  Counsel failed to introduce evidence of Washington's income sources to refute the robbery motive.

6.  Washington was not competent to stand trial, so his plea was not knowing and voluntary.

7.  The DNA evidence against him was "fabricated, frivolous, and coerced."

8. The sentence is excessive.

9. Counsel was ineffective for failing to conduct a prompt investigation of the circumstances of the case.

Washington has also filed a motion to amend his petition.

## II.

As amended by the Antiterrorism and Effective Death Penalty Act, federal statutes require state prisoners to meet several procedural requirements before a federal court may grant relief in habeas corpus.  First, the petitioner must file his claim timely.  28 U.S.C. § 2244(d)(1)(A).  Next, he must exhaust his state court remedies before filing in federal court. 28 U.S.C. § 2254(b)(1)(A).

### A.  Timeliness

Under 28 U.S.C. § 2244(d)(1), a petitioner has one year in which to file a federal habeas corpus petition.  The statute of limitations runs from the latest of:

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by state action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1).  The time during which a properly filed state habeas petition is pending does not count towards the one year limit.  28 U.S.C. § 2244(d)(2).

Subsection (A) is the usual way in which the statute of limitations is calculated.  When the Supreme Court of Virginia refused Washington's petition for appeal, Washington had 90 days in which to petition the United States Supreme Court for further direct review.  He did not file a petition for certiorari, and the time for filing such a petition expired on August 29, 2019, or 90 days after the May 31, 2019, refusal by the state's high court.  That is the date on which the statute of limitations began to run, unless one of the other less frequent situations applied.  The last date for filing his federal habeas petition under this section was August 31, 2020 (because August 29, 2021, was a Saturday).

Washington asserts that the state created an impediment to his filing by neglecting to rule on the habeas petition filed in the Charlottesville Circuit Court.  However, that court has no record of receiving a state habeas petition from Washington.  If such petition was mailed, it was not received.  The state is not responsible for delivery of the U.S. mail.  While such circumstances may provide a basis for equitable tolling of the statute of limitations, the lost mail does not constitute "State action in violation of the Constitution or laws of the United States."  Nor did the state create an impediment to the filing of his federal petition.  Washington remained free to file a federal petition without a decision from the state, as he did when he filed the current § 2254.  Theoretically, if interpreted as Washington would suggest, the statute of limitations would never start running if the mail is never found, and the state could do nothing to remove the impediment caused by the lost mail.  Subsection (B) does not change the filing deadline for Washington.

13

Washington is not alleging any newly recognized constitutional violation.  Ineffective assistance of counsel, constitutional protections afforded by the various amendments to the Constitution, and the due process right to competence have all been recognized for decades. Accordingly, subsection (C) does not change the filing deadline.

Finally, in his response to the motion to dismiss, Washington asserts that his petition is based on "newly discovered evidence" (ECF No. 22 at 3), especially that "evidence" contained in his motion to amend his petition (ECF No. 19).  Subsection (D) only applies to newly discovered facts, not new arguments of law.  See United States v. Nunez-Garcia, 31 F.4th 861, 866 (4th Cir. 2022) (holding that time begins when the petitioner knows the important facts, not when the petitioner recognizes their legal significance).  Washington's claims arise from a core set of facts, namely the conduct of the trial court, the prosecutor, and defense counsel at the time the matter was pending in the circuit court.  Washington has been aware of these facts the whole time; he has not discovered some new and previously unknown fact.  Therefore, subsection (D) does not change the deadline for filing his federal petition.

The next issue regarding timeliness is whether some event interrupted the running of the statute of limitations.  The statute provides one method of tolling:  A properly filed petition for state post-conviction relief.  28 U.S.C. § 2244(d)(2).  The respondent takes the position that no state petition has been filed.  The court need not reach this question, because the outgoing mail log submitted by Washington (and by the respondent) shows that correspondence from Washington was mailed to the court on June 12., 2020, which was past the state's statute of limitations.  Unlike the federal statute, Virginia requires state habeas

petitions to be filed within two years from the date of final judgment in the trial court or within one year from final disposition of the direct appeal in state court. Va. Code § 8.01-654(A)(2). The direct appeal in state court ended on May 31, 2019, when the Supreme Court of Virginia refused Washington's petition for appeal, and that is when the one-year state statute of limitations began to run. Washington's state petition was due by June 1, 2020, because May 31, 2020, was a Sunday. By the institution's mail log, the petition was not placed in the institutional mail until June 12, 2020, more than 10 days after the statute of limitations expired.

The Supreme Court has emphasized that an untimely state petition is not properly filed. Pace v. DiGuglielmo, 544 U.S. 408, 413 (2005). To be properly filed, the petition must be delivered in compliance with the applicable laws and rules governing filings, including format and time requirements. Artuz v. Bennett, 531 U.S. 1, 8 (2000). Even applying the liberal "mailbox rule," which considers a pleading filed when delivered to prison officials for placement in the institutional mail,[6] Washington's state petition was untimely. Because the petition was not delivered to prison officials timely, it could not be properly filed, regardless of when or if it was ultimately received in Charlottesville Circuit Court. Therefore, the state petition did not toll the federal statute of limitations, which expired on August 31, 2020.

The United States Supreme Court has recognized another narrow exception to the statute of limitations, equitable tolling. If a petitioner has pursued his rights diligently and some extraordinary circumstances prevented his timely filing, then the federal court has

---

[6] The Court explained the rationale for the "mailbox rule" in Houston v. Lack, 487 U.S. 266, 270–71 (1988).

discretion to toll the statute of limitations on equitable grounds.  Holland v. Florida, 560 U.S. 631, 636, 649 (2010).  Had Washington timely deposited his petition with prison authorities, then the disappearance of the petition might well be the type of extraordinary circumstance that would justify tolling the federal statute, if Washington diligently pursued his rights.  However, he did not timely mail his state petition, nor did he diligently pursue his rights.  Washington's § 2254 petition was notarized on November 4, 2021, and the envelope was postmarked November 16, 2021, more than one year after the federal statute of limitations expired and nearly one and a half years after he mailed his state petition.

In evaluating the timeliness of Washington's efforts, one must consider how a timely state petition, both received and ruled on in the state court, would affect the filing deadline for a federal petition.  Statutory tolling does not re-start the one-year statute of limitations; under the statute, filing a state petition suspends or interrupts the running of the statute. When the state petition is no longer pending, the time starts running where it left off.  Harris v. Hutchinson, 209 F.3d F.3d 325, 328 (4th Cir. 2000).  If Washington had timely filed the state petition on June 1, 2020, 277 days of his one-year would have already passed.  Because 2020 was a leap year, that left 89 days on the statute of limitations, which fell on a Saturday, giving him an extra two days, so that his federal petition would have been due 91 days after the state court decided the state petition.  When Washington learned that his state habeas had not been received, diligence would require that he filed his federal petition no later than 91 days thereafter.

Washington does not say when he learned that the petition had not been received. However, he wrote only two letters of inquiry to the Charlottesville Circuit Court, one in

August 2020 and one in December 2020.  He also wrote the Attorney General on February 2, 2021.  It is reasonable to believe that Washington knew or should have known by the end of February 2021 that his state petition had not been received.  Reasonable diligence would suggest that he should have dispatched his § 2254 petition as promptly as possible, but no later than the end of May 2021, but he did not do so until November 2021.  That is not diligent exercise of his rights.

Because his state petition was mailed untimely and he did not exercise reasonable diligence in pursuing his federal petition, the court finds no reason to equitably toll the statute of limitations.  Washington's petition is untimely.  Further, any claims that Washington seeks to raise by amending his petition are also untimely, and the court will deny the motion to amend his petition.

**B.**  Exhaustion/Procedural Default

Even were the court to overlook the timeliness issue, Washington's claims suffer another major deficiency:  His claims are procedurally defaulted.  To exhaust his claims, a petitioner must present his federal constitutional claims to the highest state court before he is entitled to seek federal habeas relief.  O'Sullivan v. Boerckel, 526 U.S. 838, 842 (1999).  Failure to do so "deprive[s] the state courts of an opportunity to address those claims in the first instance."  Coleman v. Thompson, 501 U.S. 722, 732 (1991).  A claim that has not been presented to the highest state court and would be procedurally barred as untimely or successive if the petitioner tried to present the issue to the state court now is considered simultaneously exhausted and defaulted.  Bassette v. Thompson, 915 F.2d 932, 936–37 (4th Cir. 1990).

None of Washington's claims have been decided by the state circuit court, and they have never been presented to the state's highest court, the Supreme Court of Virginia. Accordingly, they are all procedurally defaulted. Before a federal habeas court will consider a procedurally defaulted claim, the prisoner must show both cause for the default and actual prejudice from the claimed federal violation. Coleman, 501 U.S. at 750. The true cause for procedural default is that Washington's state petition was untimely, and that does not constitute "good cause." Even if the court charitably considered the "cause" to be the disappearance of his state petition in the mail, Washington cannot establish the prejudice prong. To show prejudice to overcome procedural default, a petitioner must show that the claimed violation worked to his "actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." United States v. Frady, 456 U.S. 152, 170 (1982). Washington has not made such showings, as discussed more fully in the next subsection.

A different standard applies for overcoming default on claims involving ineffective assistance of trial counsel. One overcomes default of such claims if the following conditions are met: (1) the claim of ineffective assistance of counsel is a "substantial claim," meaning that it has some merit; (2) the "cause" of the default is the lack of counsel or ineffectiveness of counsel; (3) the state post-conviction proceeding was the first time ineffective assistance of counsel was raised; and (4) the state post-conviction proceeding was the first one in which a petitioner was actually or effectively allowed by state law to raise the claim. Martinez v. Ryan, 566 U.S. 1, 13–15 (2012); Trevino v. Thaler, 569 U.S. 413, 423 (2013).[7] Washington

---

[7] Martinez and Trevino do not excuse untimely filing, however. Arnold v. Clarke, No. 7:17cv00453, 2017 WL 6065325, at *2 (W.D. Va. Dec. 7, 2017). Although the Fourth Circuit Court of Appeals has not addressed this issue, other districts within this circuit have reached the same result. E.g., Cobos v. Hooks, No. 1:19cv00210, 2020 WL 7049555, at *2–3 (W.D. N.C. Dec. 1, 2020); Liburd v. Williams, No. 0:20-1746, 2020 WL 7000865, at *4 (D.S.C. Aug.

cannot overcome procedural default on his ineffective assistance of counsel claims because they are not substantial, as discussed more fully in the next subsection.

## C. Analysis of Claims

### 1. Pre-Plea Government Conduct Claims

Because Washington's conviction is based upon his plea of guilty to the charges, the grounds upon which his challenges can be based are limited. A valid guilty plea waives the right to a fair trial and other trial-related rights, such as the right to a jury, the privilege against self-incrimination, and the right to confront one's accusers. Class v. United States, 138 S.Ct. 798, 805 (2018). A valid guilty plea also "renders irrelevant" constitutionality of case-related government misconduct that took place before the plea was entered, such as Fourth and Fifth Amendment violations. Id. Finally, by pleading guilty, a defendant relinquishes any factual claim that would contradict the admissions necessarily made by pleading guilty to the charges. Id. For this reason, most of Washington's habeas claims would have failed, and he therefore cannot be prejudiced by the procedural default of those claims.

His first claim, that his detention was unlawful because neither his fingerprints nor DNA were found on the murder weapons, challenges the legality of his arrest and detention based on case-specific facts that pre-dated his guilty plea. By pleading guilty, he lost the right

---

24, 2020); Kelly v. Clarke, No. 1:20cv805, 2021 WL 1990892, at *5 n.7 (E.D. Va. May 18, 2021). Likewise, other circuit courts are in accord. Lombardo v. United States, 860 F.3d 547, 561 (7th Cir. 2017), cert. denied, 138 S.Ct. 1032 (2018); Arthur v. Thomas, 739 F.3d 611, 630 (11th Cir. 2014); Bland v. Superintendent Greene SCI, No. 16-3457, 2017 WL 3897066, at *1 (3d Cir. Jan. 5, 2017); Shank v. Vanoy, No. 16-30994, 2017 WL 6029846, at *2 (5th Cir. Oct. 26, 2017); Taylor v. Eppinger, No. 16-4227, 2017 WL 5125666, at *2 (6th Cir. June 2, 2017); United States v. Robinson, 762 F. App'x 571, 576 (10th Cir. 2019) (unpublished). Thus, even if Washington's ineffective assistance claims survived his procedural default, his federal petition is still untimely.

to object to the validity of his arrest and detention.  Id.  Further, the Commonwealth is not required to show fingerprint and DNA evidence to support a conviction beyond a reasonable doubt.  Exline v. Commonwealth, No. 1361-13-4, 2014 WL 7085976, at *4 (Va. Ct. App. Dec. 16, 2014) (unpublished).  If such evidence is not required to support a conviction, it is certainly not required to support probable cause for arrest or reasonable suspicion for detention.  This claim would be without merit even if Washington had gone to trial.  Because he pled guilty and thereby waived the right to contest case-specific constitutional violations, it has even less merit.  The claim certainly does not show any error that infected his case with error of constitutional proportions.

Next, Washington avers that "discovery confirms his claim in criminal court that he was acting in defense of others."  Acting in defense of others is a fact that contradicts the admissions necessarily made when Washington pled guilty to premeditated capital murder in the commission of a robbery.  As such, the claim was never cognizable on habeas review. Thus, procedural default of this claim has not resulted in actual prejudice.

In Washington's fourth claim, he raises seven specific claims of the prosecutor violating his constitutional rights.  He claims the prosecutor violated the First Amendment by violating Washington's role as a spiritual elder in the family.  It is unclear exactly what conduct Washington complains of in that violation.  The prosecutor allegedly violated Washington's Second Amendment right to defense of others; while Washington's interpretation stretches the meaning of the Second Amendment beyond recognition, defense of others is contrary to the facts necessarily admitted in his plea, rendering this habeas claim unavailable, even if it had not been defaulted.  Washington alleges Fourth Amendment

20

violations in that gifts were taken from him, asserting that the victims had given him gifts which the Commonwealth took away.  Because scant detail was provided to explain this allegation, the court assumes Washington is complaining that RCA's large screen television and cell phones belonging to the victim were removed from Washington's home when they searched his property.  Again, such pre-plea Fourth Amendment violations are no longer cognizable once a guilty plea is entered.  Class, 138 S.Ct. at 805.  Washington's claim that he was questioned without Miranda warnings is also an alleged pre-plea constitutional violation that is lost when pleading guilty.  Washington's claim that the prosecutor violated the Eighth Amendment by charging him with a death penalty offense when he was innocent is an alleged constitutional violation that occurred before he entered his guilty plea; further, it asserts facts that directly contradict the admissions necessarily made by his entry of a guilty plea—even though the plea was an Alford plea.

The last two constitutional violations allegedly committed by the prosecutor were violations of his Sixth Amendment rights, because the defense confused him, and violation of his Fourteenth Amendment right to be free from systemic racism.  Washington does not provide enough specific information for either allegation to state a cognizable habeas claim. He does not say how or why the prosecutor is responsible for the defense confusing him. He does not identify any specific way in which systemic racism affected his case, either before or after his guilty plea.  For the reasons stated, none of Washington's habeas claims based on the prosecutor's alleged violation of Washington's constitutional rights could have prevailed on the merits, had they not been defaulted.  Therefore, there is no actual prejudice to Washington from the default of his fourth claim.

In claim seven, Washington alleges that the DNA evidence against him was "fabricated, frivolous, and coerced."  The DNA analysis in the case potentially implicating Washington came from a cap and dishwashing gloves, both found in the dumpster outside his apartment complex.  The inside of the gloves contained a mixture of DNA from four contributors.  Victim MA could not be eliminated as a contributor (31 trillion times more likely than a coincidental match to an unrelated white person), nor could Washington (2.8 million times more probable than a coincidental match to an unrelated Black person). R. at 986-987.  The navy blue stocking cap contained a mixture of DNA from three contributors; Washington could not be eliminated as a contributor (34 billion times more probable than a coincidental match to an unrelated Black person).  As indicated in the factual summary, at the plea hearing, defense counsel stated that, had the matter gone to trial, the defense was prepared to offer an expert witness to challenge the DNA evidence against Washington.  By his knowing and voluntary guilty plea, however, Washington relinquished his right to cross-examine the state's forensic experts and to introduce his own witness in response.  Class, 138 S.Ct. at 805.  Accordingly, this claim would not be heard on direct appeal or habeas review, and Washington was not actually prejudiced by defaulting the claim.

2. **Sentencing Claims**

Washington's third claim is that the trial judge violated the Virginia Canons of Justice by refusing to consider "mitigation evidence of three years of history which demonstrated self-defense."  Trial counsel introduced significant mitigating evidence, as noted in the earlier factual summary.  Washington has not identified what "three years of history" the judge refused to consider, nor is there any indication in the sentencing transcript that the judge

refused to hear any of the proffered mitigation evidence.  Thus, Washington has failed to

identify what the court did not consider and how he was prejudiced by the court's failure to

consider it.  See Bassett v. Thompson, 915 F.2d 932, 940–41 (4th Cir. 1990) (holding that

general claim that does not proffer what witness would have said is insufficient to state

claim).  Further, violation of Virginia Judicial Canons by itself does not provide a cognizable

basis for federal habeas review.  Metaphyzic El-Ectromagnetic Supreme-El v. Director,

Dep't of Corrections, No. 3:14CV52, 2015 WL 1138246, at *8 (E.D. Va. March 3, 2015).

Because Washington failed to state a cognizable habeas claim, there is no prejudice to him

from the procedural default.

In claim eight, Washington alleges that his sentence is excessive.  While life plus 40

years is a lengthy sentence, nothing in current jurisprudence supports an argument that this

sentence is constitutionally excessive punishment for two homicides committed by an adult.

Murder is the most serious and irrevocable crime.  Kennedy v. Louisiana, 554 U.S. 407, 438

(2008); Graham v. Florida, 560 U.S. 48, 69 (2010).  Washington has been spared the most

serious penalty that can be imposed, the death penalty.  Graham, 560 U.S. at 69.  Although

his sentence is life without parole, the sentence was not an automatic and mandatory result

of his conviction.  The trial court had the opportunity to hear mitigating evidence and

considered that mitigating evidence before imposing the sentence found appropriate under

the circumstances.  The court acknowledged that he had the power to suspend all or part of

any sentence he imposed, including Washington's.  Sent. Tr. at 10, 321, 343–344.  However,

he chose not to do so in this case, which he described as "one of the worst, most vicious,

vile, inhuman, horrible crimes" that he had ever seen.  Id. at 352–353.  The United States

Supreme Court recently affirmed a discretionary sentence of life without parole for a 15-

year-old juvenile who committed murder, rejecting that defendant's Eighth Amendment

challenge.  Jones v. Mississippi, 141 S.Ct. 1307, 1322 (2021).  The court noted that,

regardless of the defendant's age:

> [A]ny homicide . . . is a horrific tragedy for all involved and for
> all affected.  Determining the proper sentence in such a case
> raises profound questions of morality and social policy.  The
> States, not the federal courts, make these broad moral and policy
> judgments in the first instance when enacting their sentencing
> laws. . . .
>
> The Court's precedents require a discretionary sentencing
> procedure in a case [involving a juvenile defendant.  The
> sentencing in this case] complied with those precedents because
> the sentence was not mandatory and the trial judge had discretion
> to impose a lesser punishment in light of Jones's youth.

Id.  Washington, age 30 at the time of the two murders, was not a juvenile.  However, if a

discretionary sentence of life without parole is constitutional for a 15-year-old who killed one

person, it is certainly not excessive for an adult convicted of killing two people.  Because this

claim is not supported by law, Washington cannot demonstrate prejudice from his

procedural default.

### 3. **Competence to Stand Trial/Enter Plea**

Washington alleges in claim 6 that his plea was not knowing and voluntary because he

was incompetent to stand trial.  However, the evidence does not support his claim of

incompetence.  Counsel timely requested that Washington be evaluated for competency, and

the evaluation was performed by Dr. Murray.  Dr. Murray found him competent to stand

trial, and the court accepted Dr. Murray's opinion.  Dr. Murray noted that some aspects of

court proceedings might take additional time, to ensure that Washington was keeping up,

because of Washington's intellectual deficits.  Counsel obtained two other experts <u>ex parte</u>,

Dr. Aaron and Dr. James.  All three noted Washington's low IQ, placing him in the

developmentally disabled range, but none found him incompetent to stand trial.  The law has

long recognized that:

> Mentally retarded persons frequently know the difference
> between right and wrong and are competent to stand trial.
> Because of their impairments, however, by definition they have
> diminished capacities to understand and process information, to
> communicate, to abstract from mistakes and learn from
> experience, to engage in logical reasoning, to control impulses,
> and to understand the reactions of others. . . . Their deficiencies
> <u>do not warrant an exemption from criminal sanctions</u>, but they
> do diminish their personal culpability.

<u>Atkins v. Virginia</u>, 536 U.S. 304, 318 (2002) (emphasis added).  Washington's intellectual

deficits do not render him incompetent to stand trial, nor did they render him incapable of a

knowing, voluntary plea.  This claim is without merit.

### 4.  <u>Ineffective Assistance of Counsel Claims</u>

Washington's remaining claims, 5(a) through 5(l) and 9, allege ineffective assistance of

counsel.  A defendant in a criminal case is entitled to the effective assistance of counsel

when deciding whether to enter a plea of guilty.  <u>Padilla v. Kentucky</u>, 559 U.S. 356, 364

(2010).  Further, a petitioner seeking federal habeas relief for defaulted claims of ineffective

assistance of counsel benefits from a slightly more lenient test for overcoming procedural

default.  A petitioner may overcome procedural default if the following four criteria are met:

(1) the claim of ineffective assistance of trial counsel is a "substantial claim;" (2) the cause

for default is the lack of counsel or ineffectiveness of counsel under the standards of

<u>Strickland v. Washington</u>, 466 U.S. 668 (1984); (3) the state post-conviction proceeding was

the first time ineffective assistance of counsel was raised; and (4) the state post-conviction proceeding was the first one in which petitioner was actually or effectively allowed by state law to raise the claim.  Martinez v. Ryan, 566 U.S. 1, 13–15 (2012).

In the present case, Washington was not represented by counsel in his state post-conviction proceedings, and the court presumes that the lack of representation contributed to his procedural default of his ineffective assistance claims.  Further, in Virginia, claims raising ineffective assistance of counsel must be asserted in state habeas proceedings and are not cognizable on direct appeal.  Lenz v. Commonwealth, 261 Va. 451, 460, 544 S.E.2d 299, 304 (2001).  The remaining issue is whether Washington's claims of ineffective assistance constitute "substantial claims."  A claim is substantial if it has some merit.  Martinez, 566 U.S. at 14.

To prevail on a claim of ineffective assistance of counsel, a petitioner must show that (1) counsel's performance was so deficient that she was not functioning as counsel guaranteed by the Sixth Amendment and (2) the deficient performance prejudiced the defense.  Strickland, 466 U.S. at 687.  Deficient performance requires a showing that the attorney's performance fell below "an objective standard of reasonableness . . . under prevailing professional norms."  Id. at 688.  The habeas court must presume that counsel's decisions and actions fell within the wide range of reasonable strategy decisions and must not rely upon "the distorting effects of hindsight."  Id. at 689–90.  In the context of a plea bargain, to satisfy the prejudice requirement, the petitioner must show that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial."  Hill v. Lockhart, 474 U.S. 52, 59 (1985).  Such

prejudice is judged by an objective standard, meaning that the petitioner must convince the court that a decision to reject the plea bargain would have been reasonable and rational under the circumstances. Padilla, 559 U.S. at 372. The court now evaluates each of Washington's ineffectiveness claims to see if any have merit under these standards.

The twelve subclaims of claim 5 reference Rules of Professional Conduct that Washington claims that trial counsel violated. In assessing whether counsel's performance was constitutionally deficient however, the purpose is to determine whether the defendant received a fair trial, not to enforce the Canons of Legal Ethics; thus, although rules of professional conduct may be relevant in assessing reasonableness, breach of an ethical rule does not necessarily establish violation of the Sixth Amendment right to assistance of competent counsel. United States v. Dehlinger, 740 F.3d 315, 321 (4th Cir. 2014). For the reasons stated below, however, the court finds that Washington has failed to allege facts establishing either deficient performance or ethical misconduct.

In 5(a), Washington alleges that trial counsel had a conflict of interest because "Michael Hemenway [attorney who withdrew from the case by court order entered Feb. 3, 2017, R. at 170] represented petitioner before while he was innocent of the charges." Pet. at 13, ECF No. 1. The court does not understand what conflict Washington is alleging, nor how it affected his decision to plead guilty more than seven months later. As stated, the claim has no merit and is not substantial.

In 5(b), Washington alleges that trial counsel failed to contact his former therapist to give "impactful evidence" about Washington's impairment background. Washington's claim has no merit because he does not indicate what the "impactful evidence" was. Further, he

27

does not identify the former therapist or provide a summary of what the person's testimony would have been if called. He does not indicate whether the therapist would have testified at a trial to determine guilt or innocence or whether the therapist would have testified at sentencing. If the therapist would have testified at trial, then the claim cannot be raised in habeas, because Washington's guilty plea waived the right to trial. Class, 138 S.Ct. at 805. If the therapist would have testified at the sentencing hearing about Washington's impairments, the testimony would be cumulative, as Dr. James and Dr. Aaron both testified at length about Washington's intellectual impairments. Failure to introduce cumulative evidence cannot prejudice a petitioner. Huffington v. Nuth, 140 F.3d 572, 581 (4th Cir. 1998); Hunt v. Nuth, 57 F.3d 1327, 1333 (4th Cir. 1995). Finally, tactical decisions regarding which witnesses to call are reserved to the sound discretion of counsel and will be presumed reasonable in the absence of evidence to the contrary. United States v. Terry, 366 F.3d 312, 317 (4th Cir. 2004).

Claim 5(c) alleges that trial counsel violated rules of professional conduct by failing to report misconduct, namely that Charlottesville Police questioned Washington without reading him Miranda rights. A lawyer's duty to report misconduct pertains to reporting professional misconduct of another attorney, not police misconduct. Rule 8.3, Va. Rules of Prof. Conduct. When Washington initially spoke with police, he denied any involvement in the crimes and claimed he did not even know the victims. Later, in letters he mailed to several parties from the jail, including to the Attorney General's Office, he gave different, conflicting versions of the events. Statements in those letters were not the result of custodial interrogation and would have been fully admissible. Whether counsel should have filed a

motion to suppress his statement to police is a decision committed to the sound discretion of counsel.  As a matter of strategy, Washington cannot show that reasonable counsel would have filed a motion to suppress, because the Commonwealth could have used Washington's numerous other statements against him, some of which were far more inculpatory.  Counsel is not required to file futile motions.  <u>Moody v. Polk</u>, 408 F.3d 141, 151 (4th Cir. 2005).  For the same reason, there was no prejudice to Washington from counsel's failure to file a motion to suppress.

In claim 5(d), Washington complains that counsel did not question investigators about his timeline and his own witnesses.  It is unclear in 5(d) whether he is claiming (1) that counsel failed to question his own witnesses or (2) that counsel did not question the investigators about the witnesses.  In any event, claim 5(e) alleges that counsel never questioned prosecution witnesses and investigation witnesses.  A lawyer has the duty to conduct a pretrial investigation that is reasonable under prevailing professional norms.  <u>United States v. Roane</u>, 378 F.3d 382, 410 (4th Cir. 2004).  For example, failure to interview a witness cannot establish ineffective assistance when the witness's information is otherwise known to counsel through reports, statement summaries, or other means.  <u>Turner v. Williams</u>, 35 F.3d 872, 898 (4th Cir. 1994), <u>overruled on other grounds by</u> <u>O'Dell v. Netherland</u>, 95 F.3d 1214 (4th Cir. 1996).  Because this issue has never been developed in state court, the record lacks sufficient information for this court to say whether counsel's decisions regarding witness interviews were reasonable or deficient.  However, Washington does not allege what information the investigators or other witnesses would have given, if questioned, and that is fatal to his claim, because he cannot demonstrate prejudice without

such allegations.  Turner, 35 F.3d at 898.  Claims 5(d) and 5(e) lack merit and are not

substantial.

Washington alleges in 5(f) that conflict between attorneys caused one attorney to

leave the case after two and a half years.  He alleges that he was prejudiced by the inability to

develop a trusting relationship with new counsel before the trial date.  The record supports

that attorney Snook filed a motion to withdraw, alleging that he and the Office of the Capital

Defender agreed "that conflicts have arisen with counsel which are detrimental to Mr.

Washington's case."  The pleading, which is under seal, does not elaborate on the nature of

the conflict, whether the conflict was between counsel, or whether a conflict of interest had

arisen for attorney Snook, but the court found the reasons sufficient to grant the motion to

withdraw.  Lawyers have a duty to withdraw from representation when a conflict impairs his

ability to properly represent the client.  Rule 1.6, Virginia Rules of Prof. Conduct.

Complying with ethical rules is not deficient performance.  Further, Washington has not

alleged how one counsel's withdrawal objectively impacted his decision to plead guilty;

accordingly, there is no prejudice, and claim 5(f) is without merit.

In 5(g), Washington alleges that investigators did not want to work on his case and

refused to investigate matters he asked them to investigate.  Counsel should conduct a

reasonable investigation into potential defenses, but there is no constitutional obligation to

pursue every possible lead, regardless of its usefulness.  United States v. Dyess, 730 F.3d 354,

362 (4th Cir. 2013).  Counsel is responsible for supervising the investigator and investigation

of the case; it is counsel's strategic decisions that the court must examine for reasonableness.

Washington has not alleged what investigation the investigators refused to pursue, nor has

he alleged whether he discussed his investigative requests with his attorneys.  The allegations leave the court with insufficient information to decide whether counsel's instructions to the investigator were reasonable under existing professional norms and whether any possible deficiency would cause a reasonable person not to accept the plea agreement that Washington signed.  Having failed to allege facts sufficient to establish either deficient performance or prejudice, claim 5(g) is also without merit.

In claim 5(h), Washington alleges that counsel forced him to plead guilty by threatening him with death by lethal injection and used his cognitive abilities against him. This allegation contradicts Washington's sworn statements in open court at the plea hearing. During seven pages of colloquy, Washington appropriately answered the court's questions, without any verbal assistance from counsel.  Plea Tr. at 7–14.  As relevant to the issue of force, some of the questions and answers appear below:

> Q    Have you talked with your attorneys about whether you should plead guilty, not guilty, or no contest?
>
> A   Yes, sir.
>
> Q    And after those discussions, who decided that you would enter a guilty plea?
>
> A   I did.
>
> Q   So it's your choice?
>
> A.   Yes, sir.
>
> *****
>
> Q  Has anyone connected with your arrest and prosecution, such as a police officer or detective, or Ms. Killeen, or Mr. Chapman, or anyone in their office, in any way, threatened you to get you to plead guilty?

A   No, sir.

Q   Has anyone else, in any way, tried to force you or persuade you to plead guilty against your will?

A   No, sir.

Q   So you are entering your . . . pleas of guilty today freely and voluntarily?

A   Yes, sir.

Q   Are you entering your pleas of guilty because you are, in fact, guilty of the offenses charged?

A   No, sir.

Q   Are you pleading guilty because of what you expect the Commonwealth's evidence to be and because of the strength and nature of that evidence, and you do not wish to risk that you would be found guilty by a jury trying you?

A   Yes, sir.

Q   Are you also pleading guilty to take advantage of a plea offer and do not want to risk facing a greater sentence, in this case, the death penalty?

A   Yes, sir.

Id. at 11-12.  In open court, under oath, Washington denied that he had been forced to plead guilty.  He further understood that he was pleading guilty under Alfred, to avoid the risk of trial, even though he maintained his innocence.  Subsequent questioning further established his waiver of the right to trial and other consequences of his plea.  In the absence of extraordinary circumstances, which are not present here, any habeas claim that necessarily relies on allegations that contradict petitioner's sworn statements at a plea hearing will be summarily rejected.  United States v. Lemaster, 403 F.3d 216, 222 (4th Cir. 2005).

To the extent that Washington is alleging his fear of lethal injection as the tool by which his attorneys "forced" him to plead guilty, counsel's legal and ethical duty was to fully and honestly advise Washington about the strength of the Commonwealth's case and the likely outcome of a contested trial. Guideline 10.9.1 of the American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (2003) states that defense counsel in a capital case have the duty to seek an agreed-upon disposition. Specifically, counsel must take all appropriate steps at every stage of the case to try to achieve an agreed upon disposition. Id. at 10.9.1(A). Further, at every stage of the case, counsel should discuss with the client "the possibility and desirability of reaching an agreed upon disposition." Id. at 10.9.1(B). The commentary notes that it is often necessary for counsel to persuade the client to accept an agreement when it is in his best interest to do so. In many capital cases, the evidence of guilt is strong, and a guilty plea in exchange for life imprisonment is the best available outcome possible. Because death is different, the serious obligation of trying to save a client's life requires counsel to be brutally honest about the likely consequences of a capital trial. Washington's counsel was not deficient in doing so, nor was he prejudiced by their performance. Claim 5(h) is without merit.

In claim 5(i), Washington alleges that counsel was ineffective for failing to advise him that a second attorney and the mitigation social worker had resigned from the office until it had already happened, leaving Washington insufficient time to build a "trusting relationship with new members of the defense team." Washington was represented by the Virginia Capital Defenders Office, a group of trained, experienced, and qualified defenders for death penalty cases, which was appointed to represent indigent defendants in capital cases at the

time of Washington's trial in 2018.[8]  The law is well settled that an indigent defendant

cannot choose his counsel and "may not insist on representation by an attorney he cannot

afford or who for other reasons declines to represent the defendant."  Wheat v. United

States, 486 U.S. 153, 159 (1988).  Defendants who do not have the means to hire their own

lawyers "have no cognizable complaint so long as they are adequately represented by

attorneys appointed by the courts."  United States v. Marshall, 872 F.3d 213, 218 (4th Cir.

2017).  Further, the Supreme Court has held that the Sixth Amendment right to counsel

does not include the right to "a meaningful relationship" with counsel.  Morris v. Slappy, 461

U.S. 1, 13–14 (1983).  Thus, Washington's claim is without merit.

In claim 5(j), Washington alleges that counsel failed to report police misconduct in

fabricating phone records and failing to read Washington his Miranda rights.  In support of

this claim, Washington cites Rule 8.3 of the Virginia Rules of Professional Conduct, a

subsection of "Maintaining the Integrity of the Profession."  Rule 8.3 requires lawyers to

report certain misconduct of other lawyers to the state Bar.  There is no requirement to

report police misconduct to the Bar.  Accordingly, this portion of the claim is without merit.

Washington also alleges in this claim that counsel was ineffective for failing to report

the misconduct of the Commonwealth Attorney, including entrapment, perjury, treason,

violations of the Federal Rules of Criminal Procedure, and violation of his constitutional

rights under the First, Second, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments.

For the reasons discussed in subsection (C)(1) above, the Commonwealth did not violate

---

[8] Effective July 1, 2021, the General Assembly abolished capital punishment in Virginia, see Va. Code §
18.2-10 (2021 Supp.), and the Capital Defender Offices were closed.

Washington's constitutional rights under the Bill of Rights.  The Federal Rules of Criminal Procedure do not apply in state courts, so that was not misconduct by the prosecutor. Washington has failed to state any facts supporting entrapment, treason, or perjury. Washington has failed to establish that any conduct of the prosecutor constituted misconduct that counsel was required to report to the Bar, and this claim is without merit.

Washington claims in 5(k) that counsel was ineffective for failing to explain the "relationship evidence" to the court.  This claim is contradicted by the record.  Counsel argued to the trial court the evidence of Washington's relationship with M.A., including the phone calls, text messages, Facebook posting of love message from M.A. to Washington. Sent. Tr. at 321-322.  Because there is no factual support for this claim, it is without merit.

In 5(l) Washington complains that counsel failed to introduce evidence of Washington's income sources to refute the robbery motive.  Counsel had no duty to introduced evidence to contradict robbery motive, because Washington pled guilty to capital murder, that is, willful, deliberate, and premeditated murder of RCA during the course of robbery.  A defendant who has pled guilty may neither appeal nor collaterally attack counsel's failure to introduce evidence contradicting the facts to which he has pled guilty. Class, 138 S.Ct. at 805.  Further, there is no prejudice to Washington from failure to introduce "other income sources."  Having other income sources does not explain Washington's possession of RCA's large screen television, car, and three cell phones from the home.  Washington's explanation that the cell phones were gifts does not ring true, especially since one of the phones was found in the dumpster near his apartment.  Because

Washington has shown neither deficient performance nor prejudice, and because this claim seeks to introduce facts contradicting his guilty plea, this claim is without merit.

Washington's final allegation of ineffective assistance is found in claim 9, where he alleges that counsel was ineffective for failing to conduct a "prompt investigation of the circumstances of the case." Clearly, defense counsel has an obligation to conduct an adequate legal and factual investigation of the case. Huffington v. Nuth, 140 F.3d 572, 580 (4th Cir. 1998). This duty exists even when the client pleads guilty, because a defendant is entitled to effective assistance of counsel when counsel advises a course of action, including a guilty plea. Padilla, 599 U.S. at 364 (2010). However, Washington has failed to allege what further investigation counsel could or should have conducted, and he has failed to explain what such investigation would have revealed. These failures are fatal to his claim. Bassette v. Thompson, 915 F.2d 932, 940–41 (4th Cir. 1990).

## III.

For the reasons stated, Washington's petition is untimely and is not saved by equitable tolling, and his motion to amend the petition will be denied. Alternatively, his claims were not exhausted and were thereby defaulted, and he has failed to establish the cause and prejudice required to overcome his procedural default.

When issuing a final order adverse to a § 2254 petitioner, the court must issue or deny a certificate of appealability. Fed. R. Gov. § 2254 Cases 11(a). A certificate of appealability may issue only if the movant has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). The movant must show that reasonable jurists could debate whether the petition should have been resolved in a different manner or that

the issues presented were adequate to deserve encouragement to proceed further. Miller-El v. Cockrell, 537 U.S. 322, 338 (2003); Slack v. McDaniel, 529 U.S. 473, 483–84 (2000). In the context of a procedural ruling, the movant must demonstrate both that the dispositive procedural ruling is debatable and that the action states a debatable claim of the denial of a constitutional right. Gonzales v. Thaler, 565 U.S. 134, 140–41 (2012). Washington has not made such showings in this case.

For the foregoing reasons, the court will deny petitioner's motion to amend the petition, grant respondent's motion to dismiss, dismiss the petition for a writ of habeas corpus, and deny a certificate of appealability.

**ENTER:** This 20th day of January, 2023.

Digitally signed by Michael
F. Urbanski     Chief U.S.
District Judge
Date: 2023.01.20 16:50:53
-05'00'

_____
Michael F. Urbanski
Chief United States District Judge